IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
**F I L E D**
July 21, 2008
Charles R. Fulbruge III
Clerk

No. 07-40651

CODY WHEELER; DON DAVIS; DAVEY WILLIAMS

           Plaintiffs-Appellees

v.

PILGRIM'S PRIDE CORP

           Defendant-Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before REAVLEY, JOLLY, and GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

  This appeal presents a single narrow question: whether a plaintiff must prove an adverse effect on competition to prevail in a suit alleging a violation of Packers and Stockyards Act Sections 202(a)-(b), 7 U.S.C. §§192(a)-(b), ("PSA"). The District Court answered this question in the negative despite the fact that the great weight of authority in our sister Circuits is to the contrary. Based on a plain-text reading of the PSA, we agree with the District Court. Therefore, we hold that a plaintiff need not prove an adverse effect on competition to prevail under 7 U.S.C. §§ 192(a)-(b). We disagree with those decisions of our sister Circuits that conflict with this holding and acknowledge that in so doing we create a circuit-split on this issue. We AFFIRM.

No. 07-40651

I

Plaintiffs-Appellees Cody Wheeler, Don Davis, and Davey Williams (together, the "Growers") are chicken farmers who grow chickens known as "broilers" for Defendant-Appellant Pilgrim's Pride Corporation ("PPC"), a chicken processor and dealer referred to as an "integrator" in the chicken industry. The Growers and PPC operate within a contractual relationship whereby PPC provides the Growers with the chicks, feed, and supplies required to raise chickens. In exchange, the Growers care for the chickens until they reach maturity and are returned to PPC. We say "returned" because the chicks, maturing chickens, feed, and medicine remain the property of PPC at all times. This is known as the "grow-out" process. It takes approximately two months to grow-out a flock. The Growers' operations (and the operations of other growers) are geographically clustered into areas called "complexes." PPC compensates the Growers under a "tournament system." In essence, PPC ranks the Growers against one another and against the other growers operating in their complex. PPC then compensates the Growers based on the quality of their broilers, the number that survive the grow-out process, and the amount of feed and supplies the Growers used.

At least one grower operates under a different system than the Growers. Lonnie "Bo" Pilgrim ("Mr. Pilgrim"), PPC's founder and chairman, purchases chicks, feed, and supplies from PPC rather than having them consigned to him. Operating in a different complex than the Growers, Mr. Pilgrim then raises the chickens at his farm ("LTD Farm") and sells them back to PPC. Rather than compensating Mr. Pilgrim under the tournament system, PPC pays Mr. Pilgrim the lesser of a weekly quoted market price or 102% of his costs. According to the Growers, Mr. Pilgrim earns more under his arrangement with PPC than they earn under their arrangements with PPC. The Growers further contend that PPC refused to offer them growing arrangements similar to Mr. Pilgrim's.

2

No. 07-40651

The Growers sued PPC under the PSA. Specifically, the Growers alleged that PPC's refusal to afford them an opportunity to operate under the same terms as an insider, is "unfair and unjustly discriminatory" and affords Mr. Pilgrim an "undue or unreasonable preference or advantage" in violation of sections 192(a)-(b).[1] The Growers raised additional claims against PPC, as well, that we need not describe in detail for the purposes of the appeal. PPC moved for summary judgment arguing that the Growers did not allege an adverse effect on competition, as required to prevail under sections 192(a)-(b). The District Court found no such requirement in the PSA and denied the motion for summary judgment. Pursuant to 28 U.S.C. § 1292(b), the District Court then entered an order certifying the following issue for appeal: "whether a plaintiff must prove an adverse effect on competition in order to prevail under 7 U.S.C. §§ 192(a)-(b)." We permitted the appeal.

II

We may review an otherwise unappealable order of a District Court pursuant to 28 U.S.C. § 1292(b), if a District Court enters an order stating that it is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." Id. Under 28 U.S.C. § 1292(b), "it is not merely the controlling question of law which is certified for appeal; it is the entire order entered by the trial court." Ducre v. Executive Officers of Halter Marine, Inc., 752 F.2d 976, 984 n.16 (5th Cir. 1985) (citations omitted). Thus, we may address all issues material to the order in question and are not limited to the "controlling question of law." See id. Indeed, some Circuits have held that we are "obliged to address the order that was certified rather than the controlling question of

---

[1] We refer to the PSA by its codified form in the United States Code, 7 U.S.C. § 192. We refer, at times, to sections 192(a)-(b) simply as (the "PSA").

law framed by the district court." Cipollone v. Liggett Group, Inc., 789 F.2d 181, 187-88 (3d Cir. 1986); see also Capital Temporaries, Inc. of Hartford v. Olsten Corp., 506 F.2d 658, 660 (2d Cir. 1974). Here, we constrain ourselves to the question of statutory interpretation that the District Court identified and that the parties briefed because that question controls this appeal. We review an issue of statutory interpretation, such as the PSA's construction, de novo. Comacho v. Tex. Workforce Comm'n, 408 F.3d 229, 234 (5th Cir. 2005).

### III

The parties raise four issues that may bear on our interpretation of the PSA: first, whether the PSA's plain text requires a plaintiff to prove an adverse effect on competition to prevail in a suit under sections 192(a)-(b); second, whether the PSA's legislative history supports an adverse effect on competition requirement under sections 192(a)-(b);[2] third, whether we must defer to the Department of Agriculture's ("USDA") interpretation of the PSA; and fourth, whether the Federal Trade Commission's ("FTC") interpretation of a similarly-worded statute bears on our interpretation of the PSA. If we find that a plaintiff must prove an adverse effect on competition to prevail under sections 192(a)-(b), PPC raises a fifth issue: whether we should dismiss this suit, rather than remanding it, because there is no evidence establishing an adverse effect on competition. Because we hold that the plain text of sections 192(a)-(b) does not require an adverse effect on competition, we need only address the first issue. We do, however, briefly discuss the PSA's legislative history because that is our point of departure from our sister Circuits.

---

[2] PPC also contends that we should follow the great weight of authority in our sister Circuits, which has held that the PSA's legislative history weighs in favor of requiring a plaintiff to prove an adverse effect on competition to prevail in a suit under sections 192(a)-(b). We acknowledge that the other Circuits have so held and address this contention in Section III.B, infra, which discusses the legislative history of the PSA and explains why we should not consider or rely on it.

No. 07-40651

A

We begin, as we should, with the plain text of the statute. See Permanent Mission of India to the United Nations v. City of New York, 127 S. Ct. 2352, 2356 (2007) (citation omitted) ("We begin, as always, with the text of the statute."); Watt v. Alaska, 451 U.S. 259, 266 (1981) (quotation omitted) ("The starting point in every case involving construction of a statute is the language itself."); see also In re Rogers, 513 F.3d 212, 225 (5th Cir. 2008). The PSA provides:

> It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:
>
> (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or
>
> (b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect; or
>
> (c) Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of <u>restraining commerce</u> or of creating a monopoly; or
>
> (d) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the

5

> acquisition of, buying, selling, or dealing in, any article, or of <u>restraining commerce</u>; or
>
> (e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of <u>restraining commerce</u>; or
>
> (f) Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article; or (3) to manipulate or control prices; or
>
> (g) Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e) of this section.

7 U.S.C. § 192 (emphasis added).

The District Court held that the text of sections 192(a)-(b) "on its face" requires no showing of an adverse effect on competition. PPC contends that the District Court erred in this determination without offering a persuasive alternative interpretation of the text. Indeed, the only textual argument PPC can muster is that the District Court should have examined the text, in light of the legislative history, rather than examining the text alone. The Growers endorse the plain-text interpretation of the District Court as the only correct reading of sections 192(a)-(b) and counter that the District Court need not have considered legislative history because the PSA's text is plain, clear, and unambiguous.

"It is well established that when a statute's language is plain, the sole function of the courts)) at least where the disposition required by the text is not absurd))is to enforce it according to its terms." Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) (quotation omitted). We look first to the specific terms of the

sections in question. Section 192(a) prohibits "unfair, unjustly discriminatory, or deceptive" practices or devices. Section 192(b) prohibits "undue or unreasonable" preferences, advantages, or disadvantages. Neither section contains language limiting its application to only those acts or devices, which have an adverse effect on competition, such as "restraining commerce." Under well-settled principles, we must refrain from reading additional terms, such as those that would require an adverse effect on competition, into these sections. See Lamie, 540 U.S. at 538 (holding that if the text evinces "a plain, nonabsurd meaning" then the court should not "read an absent word into the statute."); see also Bates v. United States, 522 U.S. 23, 29 (1997) (holding that courts "ordinarily" should "resist reading words or elements into a statute that do not appear on its face"). Neither PPC nor the other Circuits have provided an alternative reading of the plain text of sections 192(a)-(b). Nor can we say that it would be absurd to read sections 192(a)-(b) as not requiring an adverse effect on competition. Accordingly, because PPC's construction of the PSA would require us to read absent terms into the statute, we reject it.

Looking to the remaining sections of the PSA, we find further support for our view that sections 192(a)-(b) do not require a plaintiff to prove an adverse effect on competition. Sections 192(c)-(e), unlike sections 192(a)-(b), prohibit only those acts, which have the effect of "restraining commerce" or which produce another common antitrust injury, such as "creating a monopoly." If Congress had intended to limit the scope of sections 192(a)-(b) to prohibit only those acts with the effect of "restraining commerce," it could have included the same language it employed in sections 192(c)-(e). Congress did not. This omission is strong evidence that Congress did not intend sections 192(a)-(b) to require a plaintiff to prove an adverse effect on competition. See Russello v. United States, 464 U.S. 16, 23 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972) ("'Where Congress includes particular language in one section of

a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'").[3]  Similarly, if Congress had intended for the courts to read "restraining commerce" into every section of the PSA, then we see no reason why Congress would have included "restraining commerce" only in sections 192(c)-(e). Because we will not read additional terms into a statute when we believe that Congress intentionally omitted them, we cannot adopt a reading of the PSA that engrafts an adverse effect on competition requirement onto sections 192(a)-(b). See Wong Kim Bo, 472 F.2d at 722.

We agree with the District Court that the language of sections 192(a)-(b) is plain, clear, and unambiguous, and that it does not require the Growers to prove an adverse effect on competition.  Holding that sections 192(a)-(b) plainly, clearly, and unambiguously do not require an adverse effect on competition, we go no further.  See Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 167 (2004) ("Given the clear meaning of the text, there is no need to . . . consult the purpose of [the statute] at all."); Lamie, 540 U.S. at 534 (holding that unless a statute is "ambiguous on the point at issue," a court should not resort to legislative history in interpreting it); Rogers, 513 F.3d at 225-26 (citing Carrieri v. Jobs, Inc., 393 F.3d 508, 518-19 (5th Cir. 2004)) ("Only after application of the principles of statutory construction, including the canons of construction, and after a conclusion that the statute is ambiguous may the court turn to legislative history."); Guilzon v. C.I.R., 985 F.2d 819, 823 n.11 (5th Cir. 1993) (citation omitted) ("Fifth Circuit law is crystal clear that when, as here, the language of

---

[3] We consistently have applied this canon of construction since deciding Wong Kim Bo. See, e.g., Arif v. Mukasey, 509 F.3d 677, 681 (5th Cir. 2007); Comacho, 408 F.3d at 236; Nuovo Pignone, SpA v. Storman Asia M/V, 310 F.3d 374, 384 n.16 (5th Cir. 2002); United States v. Juvenile No. 1, 118 F.3d 298, 305 (5th Cir. 1997); United States v. Shear, 962 F.2d 488, 490 (5th Cir. 1992); In re Timbers of Inwood Forest Assocs., Ltd., 793 F.2d 1380, 1402 (5th Cir. 1986).

a statute is unambiguous, this Court has no need to and will not defer to extrinsic aids or legislative history."). Accordingly, we affirm the District Court.[4]

## B

We acknowledge that our decision today conflicts with nearly every decision of our sister Circuits on this issue.[5] Their decisions, however, generally reached beyond the PSA's clear and unambiguous text, choosing instead to be guided by its legislative history, "antitrust ancestry," and "policy considerations." London, 410 F.3d at 1307. We believe that their decisions should have been guided by the text. See Cooper, 543 U.S. at 167; Lamie, 540 U.S. at 534; Rogers, 513 F.3d at 225-26; Guilzon, 985 F.2d at 823. Accordingly, this is where we depart from our sister Circuits. See id. By resting our decision on the PSA's plain text, we follow the better path: "prefer[ring] the plain meaning since that approach respects the words of Congress." Lamie, 540 U.S. at 536. "In this manner we," unlike our sister Circuits, "avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history." Id.

---

[4] We have not been asked and need not decide what injuries, which do not have an adverse effect on competition, fall within sections 192(a)-(b).

[5] *See*, e.g., Been v. O.K. Indus., Inc., 495 F.3d 1217, 1230 (10th Cir. 2007); London v. Fieldale Farms Corp., 410 F.3d 1295, 1303 (11th Cir. 2005) ("[I]n order to succeed on a claim under the PSA, a plaintiff must show that the defendant's unfair, discriminatory or deceptive practice adversely affects or is likely to adversely affect competition."); Adkins v. Cagle Foods JV, LLC, 411 F.3d 1320, 1324 n.6 (11th Cir. 2005); Pickett v. Tyson Fresh Meats, Inc., 420 F.3d 1272, 1280 (11th Cir. 2005); I.B.P., Inc. v. Glickman, 187 F.3d 974, 977 (8th Cir. 1999); Jackson v. Swift Eckrich, Inc., 53 F.3d 1452, 1458 (8th Cir. 1995); Farrow v. U.S. Dept. of Agric., 760 F.2d 211, 215 (8th Cir. 1985); De Jong Packing Co. v. U.S. Dept. Agric., 618 F.2d 1329, 1336–37 (9th Cir. 1980); Pac. Trading Co. v. Wilson & Co., Inc., 547 F.2d 367, 369–70 (7th Cir. 1976); Armour & Co. v. United States, 402 F.2d 712, 717 (7th Cir. 1968). But see Schumacher v. Tyson Fresh Meats, Inc., 434 F. Supp. 2d 748, 750–55 (D.S.D. 2006) (observing that § 192(a) concerns activities that adversely affect competition, but rejecting the conclusion that § 192(a) is limited to only those activities that adversely affect competition); Kinkaid v. John Morrell & Co., 321 F. Supp. 2d 1090, 1103 (N.D. Iowa 2004) (citing Wilson & Co. v. Benson, 286 F.2d 891, 895 (7th Cir. 1961)) ("[T]his court finds that only a strained reading of the statute could require that practices that are 'unfair' or 'deceptive' within the meaning of § 192(a) must also be 'monopolistic' or 'anticompetitive' to be prohibited.").

No. 07-40651

In our view, our sister Circuits have fallen into the very legislative history pitfall that the Supreme Court identified. Here, as in Lamie, the legislative "history creates more confusion than clarity about the congressional intent" because history and policy considerations lend support to conflicting interpretations. See id. at 539. To illustrate the point, we consider the two primary "legislative history" and "policy" bases upon which our sister Circuits rest their findings of an adverse effect on competition requirement. First, they rely on H.R. 85-1048 (1958), which states: "the primary purpose of [the PSA] is to assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry." Id. at 1. Second, they rely on Stafford v. Wallace, 258 U.S. 495, 514-15 (1922), which observed that the "chief evil" Congress feared in passing the PSA was the monopoly of meat industry packers. Most obviously, we observe that Congress spoke of assuring fair competition as the PSA's "primary" purpose, not as the PSA's only purpose, and that the Supreme Court spoke of monopoly as the "chief" evil against which the PSA protects, not as the "only" evil. Thus, Stafford does not foreclose us from holding that the PSA protects against harms that have no adverse effect on competition. See id. Moreover, a closer look at the House Report shows that it may not limit the PSA as much as the other Circuits think.

By examining the context of the very passages of the House Report upon which our sister Circuits rely, we find that we may read them to support the contrary proposition; namely, that sections 192(a)-(b) may not require a plaintiff to prove an adverse effect on competition. Although the other Circuits rightly point out that the PSA's "primary purpose" is to assure "fair competition and fair trade practices," the House described other purposes as well:

> The primary purpose of this Act is to assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry. The objective is to safeguard farmers and ranchers against receiving less than the true market value of their livestock

10

> and to protect consumers against unfair business practices in the marketing of meats, poultry, etc. Protection is also provided to members of the livestock marketing and meat industries from unfair, deceptive, unjustly discriminatory, and monopolistic practices of competitors, large or small.
>
> * * *
>
> The act provides that meatpackers subject to its provisions shall not engage in practices that restrain commerce or create monopoly. They are prohibited from buying or selling any article for the purpose of or with the effect of manipulating or controlling prices in commerce. They are also prohibited from engaging in any unfair, deceptive, or unjustly discriminatory practice or device in the conduct of their business, or conspiring, combining, agreeing, or arranging with other persons to do any of these acts.

H.R. 85-1048 at 1-2. There is little doubt that these passages support the view that the PSA's primary purpose is to protect fair competition. But the PSA goes further. It also was intended to "protect consumers from unfair business practices," to protect members of the livestock marketing and meat industries from "unfair, deceptive, and unjustly discriminatory" practices, and to prohibit meatpackers, more generally, from "engaging in any unfair, deceptive, or unjustly discriminatory practice or device in the conduct of their business." Id. Indeed, by using "also prohibited" to separate "unfair, deceptive, or unjustly discriminatory practice and device" from language describing injuries to competition such as "restrain[ing] commerce," "creat[ing] monopoly," and "manipulating or controlling prices," Congress may have evinced its intent for the PSA to sweep more broadly than only those injuries, which have an adverse effect on competition. Id.; see Spencer Livestock Comm'n Co. v. Dept. of Agric., 841 F.2d 1451, 1455 (9th Cir. 1988) (observing that the PSA's primary purpose was to assure fair competition and prevent monopolistic practices, but it also was intended to provide protection from unfair and deceptive business tactics). These passages from the House do not paint a clear picture of Congress's intent.

They create uncertainty. That is the point. "These uncertainties illustrate the difficulty of relying on legislative history here and the advantage of our determination to rest our holding on the statutory text." Lamie, 540 U.S. at 542. Better, we think, especially where Congress's intentions and concerns are less than crystal clear, to be guided by the basic precept: "it is ultimately the provisions of our laws rather than the principal [or the "primary" or the "chief"] concerns of our legislators by which we are governed." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79 (1998). In reading an adverse effect on competition requirement into sections 192(a)-(b), the other Circuits have departed from this basic rule. We will not. We rest on a plain-text reading of the PSA for our holding that sections 192(a)-(b) do not require a plaintiff to prove an adverse effect on competition to prevail thereunder. Accordingly, we need not address the remaining issues raised by the parties.

IV

For the foregoing reasons, we agree with the order of the District Court. AFFIRMED.

No. 07-40651

REAVLEY, Circuit Judge, dissenting:

　　Sections 192 (a) and (b) of the Packers and Stockyards Act may be read differently, and this panel majority reading is certainly reasonable. However, I incline to the meaning given "unfair" by the Tenth Circuit in Been v. O.K. Indus. Inc., 495 F.3d 1217 (10th Cir. 2007) and, in any event, would not create a circuit split after so many contrary circuit decisions over many years. I would reverse.